IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MARTA MARIE LEBRON, | ) | Case No. 3:24-CV-00110-JJH |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

**I.     Introduction**

Plaintiff, Marta Marie Lebron ("Lebron"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Lebron's applications for DIB and SSI be affirmed.

**II.     Procedural History**

Lebron filed for DIB and SSI on June 28, 2021, alleging a disability onset date of December 15, 2020. (Tr. 247-60). The claims were denied initially and on reconsideration. (Tr. 83-101, 102-18). She then requested a hearing before an ALJ. (Tr. 175-76). Lebron (represented

by counsel) and a vocational expert ("VE") testified before the ALJ on February 22, 2023. (Tr. 41-82).

On March 15, 2023, the ALJ issued a written decision finding Lebron not disabled. (Tr. 19-35). The Appeals Council denied her request for review on November 24, 2023, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981). Lebron timely filed this action on January 19, 2024. (ECF Doc. 1).

### III. Evidence

#### A. Personal, Educational, and Vocational Evidence

Lebron was 26 years old on the alleged onset date, making her a younger individual according to Agency regulations. (*See* Tr. 33). She graduated from high school. (*See id.*). In the past, she worked as a packer. (Tr. 32).

#### B. Relevant Medical Evidence[1]

On October 23, 2021, Lebron attended a consultative medical examination with Bradford Jones, D.O., for evaluation of her allegations of disability due to sleep apnea and depression. (Tr. 406-12). Dr. Jones noted psychosocial stressors, including difficulty with schooling and difficulty maintaining a job. (Tr. 409). Lebron attributed this to anxiety, leading to difficulty in completing regular tasks, and her learning disability continuing to present issues as an adult. (Tr. 409-10). Dr. Jones diagnosed depression and anxiety, and recommended that Lebron would benefit from further evaluation by psychiatry to characterize the etiology of her cognitive issues

---

[1] Lebron only raises error with respect to the ALJ's evaluation of cognitive impairments and her ability to work independently as a result. (ECF Doc. 7, pp. 8-14). I therefore limit the review of the medical record only to the evidence relevant to those claims. Any arguments concerning her physical impairments are deemed waived. *See Kuhn v. Washtenaw Cnty.,* 709 F.3d 612, 624 (6th Cir. 2013).

and their effect on her ability to work. (Tr. 410). He also noted relevant communicative limitations due to anxiety but found no other workplace limitations. (*Id.*).

Lebron occasionally accessed counseling for her anxiety and depression at Bayshore Counseling Services from March 2018 through May 2022, when she stopped attending against staff advice without making satisfactory progress. (Tr. 458-83). During the relevant period, Lebron attended counseling on May 4, 2022, with Amy Hertrick, LPC. (Tr. 460). Ms. Hertrick noted that Lebron was unemployed but looking for work, and that she had been attending Ohio Business School but stopped because she was having academic difficulties. (*Id.*). Lebron reported having a difficult time learning and retaining new material. (Tr. 461). Lebron reported depressed mood, fatigue, and diminished ability to think or concentrate nearly every day. (*Id.*). Ms. Hertrick noted Lebron's symptoms have impeded her from having gainful employment. (Tr. 463).

Lebron received case management from Erie County Board of Developmental Disabilities from April through December 2022. (Tr. 492-717). She completed a 2022 vision plan, which included finding a job, possibly going to school for a medical assistant degree, and to lose weight. (Tr. 530-38). Her case management plan included supports such as receiving a gas card, taxi services, and a gym membership. (Tr. 534-36). Her case manager noted that Lebron would benefit from a job coach and had made a referral for assistance with finding and maintaining a job. (Tr. 532). Lebron reported receiving support from her boyfriend, but that she was "very independent and requires minimal supports from others." (*Id.*). Lebron reported she was independent with using her phone and the internet, but that she may need assistance with understanding the mail she received. (Tr. 543). She reported she was able to transport herself to appointments, but occasionally needed reminders to get to her appointments on time or to take

her medications. (Tr. 544). Her boyfriend assisted with administering her insulin. (Tr. 684). She was able to independently complete activities of daily living. (Tr. 546-49). Lebron reported a history of verbal and physical aggression and injuring herself but was managing these issues with medication for her bipolar disorder. (Tr. 551). She was independent with money management, budgeting, and paying bills. (Tr. 553). She received housing assistance and was able to maintain her household chores and care for her pets. (Tr. 554). Effective January 3, 2023, she was determined to need assistance with bill paying and money management (Tr. 657). Lebron chose Life Out Loud to assist her with reminders to pay bills and working with her on budgeting and saving money. (Tr. 679).

Lebron's Erie County Board of Developmental Disabilities service coordinators, Paula Washek and Nick Sennish, completed a third-party Function Report on May 17, 2022. (Tr. 288-95). In it, they reported Lebron had a difficult time understanding what was expected of her and became overwhelmed easily when she cannot process information; information often needs to be rephrased so she can understand what is being told to her. (Tr. 288). She also had excessive weight gain which caused limitations with mobility and stamina. (*Id.*). She needed prompting to shower/bathe regularly and to care for her dog. (Tr. 289-90). Lebron needed to be reminded to do laundry or to take her medication, but her service providers also noted that her failure to do house or yard work was more due to a lack of motivation than a lack of ability. (Tr. 290-91). She was able to cook basic meals on the stovetop but had a difficult time following directions for more elaborate cooking. (*Id.*). She received assistance with paying bills and all money management from her boyfriend. (Tr. 291). Her service coordinators noted that it would be very difficult for her to follow written instructions because of comprehension challenges combined

4

with an inability to stay focused. (Tr. 293). She could follow one- to two-step spoken instructions, but further instructions would be forgotten. (*Id.*).

  C. **Medical Opinion Evidence**

On May 30, 2019, prior to her alleged disability onset date, Lebron attended a psychological evaluation with Wayne Morse, Ph.D. (Tr. 330-35). Dr. Morse diagnosed bipolar I disorder, moderate, in full remission; social anxiety; and specific learning disorders in math and reading comprehension. (Tr. 334). Dr. Morse found the evidence suggested Lebron has minor difficulty understanding, remembering, and carrying out multi-step workplace instructions; minor difficulty concentrating and persisting in work-related activity; minor difficulty responding appropriately to supervisors, coworkers, and the public in a work setting; and minor difficulty responding appropriately to normal pressures in a work setting. (Tr. 334-35).

On May 2, 2022, Thomas Evans, Ph.D., completed a psychological evaluation. (Tr. 417-21). He concluded that Lebron met the criteria for unspecified anxiety disorder. (Tr. 419). Dr. Evans noted that prior cognitive testing indicated a full-scale IQ score of 67. (Tr. 420). He opined she would be limited to understanding and carrying out mainly simple instructions in a workplace setting and that she would likely be limited to completing relatively simple one- to two-step tasks. (*Id.*). Dr. Evans also stated it was somewhat questionable as to whether she was capable of managing her benefits in her own best interest and without supervision, given her cognitive limitations. (Tr. 421).

On May 19, 2022, state agency reviewer Audrey Todd, Ph.D. opined that Lebron could understand, remember, and sustain simple routine tasks, and that she may work best in an environment where changes can be explained in advance. (Tr. 88-89, 97-98). Courtney Zeune,

5

Ph.D., affirmed this decision at the reconsideration level on September 8, 2022. (Tr. 107-108, 116-117).

        D.        **Administrative Hearing Evidence**

Lebron testified at a hearing before the ALJ on February 22, 2023. She stated she lived with her boyfriend and her adult brother, who is disabled. (Tr. 48). She does not provide special care for her brother. (*Id.*). She testified her boyfriend helps her to get up and get ready for work, helps her with daily reminders, brings her medications, and cooks for her. (Tr. 48-50). She does not help with the household or outdoor chores, although she sometimes will run errands. (Tr. 52).

Lebron described her days as follows: she wakes at noon or 1:00 p.m. and will stay in bed until she needs to go to work at 3:00 or 4:00 p.m.; she works until 7:00 p.m., and then will go to sleep at around 4:00 a.m. the next day. (Tr. 49-50).

Lebron described a lack of motivation to complete her personal care needs. (Tr. 51). She also had some difficulties getting out of bed in the morning due to headaches and because she was overweight. (*Id.*). She was scheduled to receive a CPAP machine to help with her headaches. (Tr. 52). She also has prediabetes, so she takes a daily shot intended to curb her appetite and help her lose weight. (Tr. 51). She did not have a valid driver's license; she did not renew her license because she had difficulty seeing at night. (Tr. 53). She uses a taxi or a bus service instead. (Tr. 53-54).

Lebron completed high school with an IEP and was attending math tutoring at a career center to obtain an STNA certificate. (Tr. 55-56). She believed she would need assistance in managing any potential benefits because she could not remember when her bills were due. (Tr. 56).

6

Lebron had previous work packing products in totes on an assembly line, where she was required to lift up to 20 pounds. (Tr. 57). She also worked as a baker, following along with recipes, and was required to lift up to ten pounds. (Tr. 58-60). Lebron felt she could not work because she was unable to keep up with the required workload, could not complete paperwork, and had difficulty making it to work on time. (Tr. 60-61).

She was taking fluoxetine for anxiety and Seroquel for depression and sleep. (Tr. 61). Even so, she found it difficult to get out of bed most days. (Tr. 65-66). She sometimes forgets to engage in personal care such as showering or changing clothes. (Tr. 66).

The VE then testified. The VE testified that Lebron had past relevant work as a packer, SVP 2, classified as medium work but performed at light. (Tr. 69). She also worked as a pastry baker, SVP 7, also classified as medium work but performed at light. (*Id.*). The VE testified that it would take two years to master the skills of the pastry baker position. The ALJ therefore determined this was not past relevant work. (*Id.*).

The ALJ then presented a hypothetical of an individual of Lebron's age, education, and vocational background, who can perform work at all exertional levels but would be limited to simple, routine, and repetitive tasks in an environment free from fast paced production, such as where pace is externally set with only simple decision-making and few workplace changes; limited to no more than occasional contact with supervisors, coworkers, and the general public, precluding tandem work groups, and the individual would require demonstrative instructions in addition to any available written instructions. (Tr. 69-70). The VE testified that no past work was available, but that the individual could perform work as a housekeeper, SVP 2, light work, approximately 220,000 jobs nationally; laundry worker, SVP 2, medium work, approximately 10,000 jobs nationally; and kitchen helper, medium unskilled, and 100,000 jobs nationally. (Tr.

7

70). These jobs would not change if the individual were limited to one- or two-step tasks. (Tr. 71).

As a second hypothetical, the ALJ added to the first hypothetical whether the individual would require frequent supervision in order to timely and correctly complete tasks. (Tr. 72). The VE testified that level of supervision would not be available in competitive employment. (*Id.*).

The VE also testified that an individual could not maintain competitive employment if they would be off task or require additional breaks more than 25 percent of the workday. (Tr. 73). Employers typically tolerate one absence per month, or up to 15 percent time off task. (*Id.*).

## IV. The ALJ's Decision

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2025.

2. The claimant has not engaged in substantial gainful activity since December 15, 2020, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: depression; anxiety; borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple, routine and repetitive tasks (1-2 step tasks) in an environment free from fast-paced production requirements (such as where the pace is externally set) with only simple decision-making and few, if any, workplace changes. Finally, the individual would be limited to no more than occasional contact with supervisors, coworkers (no tandem work groups) and the general public. Instructions to be delivered by demonstration, in addition to verbally and/or in writing alone.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on February 4, 1994, and she was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 15, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-35).

## V. Law & Analysis

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears

9

the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B.      Standard of Review**

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI. Discussion

Lebron raises two issues for this Court's review:

1. Whether at Step Five of the Sequential Evaluation, the ALJ failed to support her finding with substantial evidence when she failed to find that Plaintiff needed a job coach and/or extra supervision while engaging in substantial gainful activity.

2. Whether the ALJ's RFC was supported by substantial evidence or if she erred when she erroneously determined that the Function Report completed by Plaintiff's service coordinators had little persuasive value.

(ECF Doc. 7, p. 1). The first issue is couched as one sounding in the ALJ's Step Five determination. However, upon closer inspection, the argument contained therein focuses on the ALJ's RFC determination regarding whether or not Lebron required a job coach or extra supervision while working. (*Id.* at pp. 8-11 ("This need for additional assistance while working established that the ALJ's RFC was not supported by substantial evidence.")). Because both issues raise error with the ALJ's RFC determination, I resolve them together.

> A. **The ALJ supported her RFC determination with substantial evidence to show Lebron did not require a job coach.**

Lebron raises error with the ALJ's RFC determination when she failed to find that Lebron needed a job coach or extra supervision while engaging in substantial gainful activity. (ECF Doc. 7, p. 1). She correctly states that the ALJ has the burden to demonstrate at Step Five that there is work in the national economy that the claimant can perform, given their residual functional capacity. (*Id.* at pp. 8). She argues that such evidence may be produced through reliance on the VE's testimony responding to a hypothetical question, but implies that the hypothetical posed to the VE during the hearing was not responsive to Lebron's limitations as evidenced in the record. (*Id.* at pp. 9-12). She states that the evidence in the record corroborates the fact that Lebron has intellectual difficulties which necessitate additional assistance and reminders while performing her activities of daily living, thus supporting her contention that she needs a job coach and cannot perform work in the national economy. (*Id.* at p. 11).

In contrast, the Commissioner compares the evidence in the record against the ALJ's determination to demonstrate that the RFC was reasonable and responsive to Lebron's limitations. (ECF Doc. 9, pp. 11-19). And, while Lebron may point to evidence supportive of a finding of disability, the ALJ relied on those same records to find Lebron was more independent in her abilities than she alleges now. (*Id.*). The Commissioner points out that Lebron may disagree with the ALJ's weighing of the evidence, but this is not enough. (*Id.* at p. 17). Rather, it amounts to a request for this Court to reweigh the evidence, which it may not do. (*Id.*).

"[T]he regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC 'based on all of the relevant medical and other evidence of record.'" *Harris v. Comm'r of Soc. Sec.,* No. 1:13-cv-00260, 2014 WL 346287, at *11 (N.D. Ohio, Jan. 30, 2014). An ALJ must "provide a coherent explanation of his [or her]

12

reasoning." *Lester v. Saul*, No. 5:20-cv-01364, 20 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom., Lester v. Comm'r of Soc. Sec.,* No. 5:20-cv-01364. 2021 WL 119287 (N.D Ohio, Jan. 13, 2021).

Despite Lebron stating her first argument as a Step Five error, Lebron nonetheless retains the ultimate burden of demonstrating she is disabled. *See Combs*, 459 F.3d at 642-43. However, "[c]iting selective portions of the record that support one's own conclusion does not meet this burden." *Hollinger v. Comm'r of Soc. Sec.*, No. 1:23-CV-00418-BYP, 2024 WL 310715, at *9 (N.D. Ohio Jan. 11, 2024), *report and recommendation adopted*, No. 1:23-CV-418, 2024 WL 310092 (N.D. Ohio Jan. 26, 2024). Rather, where a plaintiff disagrees with the ALJ's analysis of her limitations, she must meet the burden of showing specifically how her impairment limits her to a degree inconsistent with the ALJ's RFC determination. *Id.*

Furthermore, I note that much of the evidence which Lebron provides in support of her position are non-medical records where she provides her own subjective statements of her functional limitations to her service providers. "Plaintiff's statements, even if made to medical personnel, are not *per se* credible[.]" *DeCaro v. Kijakazi*, No. 1:20-CV-01516, 2022 WL 911775, at *12, n.6 (N.D. Ohio Mar. 29, 2022) (collecting cases). Neither are subjective complaints transformed into objective medical data simply by the act of a provider transcribing them into treatment records. *Rogers v. Astrue*, No. 11-CV-0082-KKC, 2012 WL 639473, at *4 (E.D. Ky. Feb. 27, 2012), citing *Poe v. Comm'r of Soc. Sec.*, 342 F.App'x 149, 156 (6th Cir. 2009). And the ALJ's evaluation of subjective evidence receives great deference from a reviewing court. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). This court may not disturb the ALJ's analysis of a claimant's subjective

complaints and the conclusions drawn from it, absent compelling reason to do so. *Id*. (internal quotations and citations omitted).

> The ALJ provides the following with respect to Lebron's job coach:
>
> The claimant said she currently works four days per week, and she does not feel she could work full-time because it would be hard for her to get up for work, and because of her headaches and the drowsiness from her medications. She said [she] got her current job with assistance from her service coordinator, who helped her get a job coach and fill out applications online. She said her coach did not go to the job site with her and did not help her learn her job duties, but visits the claimant weekly to ask how she is doing and to help schedule her transportation for work.

(Tr. 26). The ALJ here takes note that Lebron's job coaching was limited to finding and applying for jobs, and to visit with her weekly and help schedule her transportation for work. The job coach does not assist Lebron on the job site, nor does the coach teach her how to learn the duties of the job. This is consistent with Lebron's testimony during the hearing regarding the assistance she receives from the job coach (Tr. 64), and is consistent with her testimony regarding her ability, at times, to work independently at past jobs (Tr. 60-61). I also note that elsewhere in the record, she is noted to be able to arrange her own transportation to appointments without mention of receiving assistance from a job coach. (Tr. 531).

> The ALJ also notes the following regarding Lebron's independence in her work and activities of daily living:
>
> The extent of dependence upon others for daily activities that is described by the claimant in her allegations and testimony is not consistent with the other evidence of record. As noted above, records from the Board of Developmental Disabilities indicate she is able to care for her personal needs, prepare a simple meal, shop, and manage her own medications without assistance. These records also indicate she understands the concept and value of money; is independent with money management, budgeting, and paying bills; and is responsible for her own finances, with no need for additional supports when making purchases. The claimant indicated she does household chores including washing dishes, cleaning the house, and taking care of the animals. She was noted to be able to drive and to arrange for

14

> her own transportation, and that there is nothing preventing her from taking part in activities of her choosing. This evidence contradicts the claimant's testimony in several regards, and this level of activity is not consistent with the severity of symptoms and limitations that she has alleged.
>
> The claimant's activities during the time at issue [include] working, even at the level of substantial gainful activity at one point, as discussed at Finding 2. Although her work as a baker is not shown to have been substantial gainful activity, it was performed at a skill level above that which would be expected, given her allegations; she testified that she was able to follow recipes and add ingredients, and she appears to have been successful in performing these tasks, as she indicated her employer wanted her to return after she quit. The claimant was able to pass a driver's test, and the record indicates she even worked as a taxi driver in 2022, while also working nights. She testified that she is currently studying for the state nurse's aide test, albeit with tutoring from her mother. These activities are likewise inconsistent with the claimant's allegations regarding the severity of her symptoms and limitations.

(Tr. 31-32).

This analysis is also consistent with Lebron's hearing testimony of her independence and ability to complete tasks on her own. It is also consistent with the function reports and treatment records Lebron relies on in support of a finding of disability. For example, Lebron provided the following in her "vision plan" at the Erie Board of Developmental Disabilities:

- "[S]he is able to transport herself to appointments or call for transportation if needed, however, she occasionally needs a reminder of when her appointments are." (Tr. 531).

- "She is independent with money management, budgeting, and paying bills." (*Id.*).

- "She is responsible for her own finances – to assist with bill paying she will use auto pay for some of the bills." (*Id.*).

- "Obstacles to becoming/maintaining employment is that she tends to leave jobs when she no longer likes it and does not like change with her hours when becoming employed. She would benefit from a job coach to assist with maintaining employment." (Tr. 532).

Her providers also discussed that she "needs prompting and encouragement to complete tasks" but that she could follow one- or two-step verbal instructions. (Tr. 293). In their assessment,

15

some of her issues with focus and follow-through were related to her level of interest in the task. (Tr. 293-95). She does not do house or yard work due to "more of a lack of motivation than it is a lack of ability." (Tr. 291).

All in all, this comparison of the ALJ's determination against the evidence contained in the record shows that the ALJ's decision was supported by substantial evidence. Throughout the record, Lebron consistently asserts to her providers that she is able to function independently and live on her own, although she needs reminders at times to complete certain tasks. But needing reminders is not indicative of disability, particularly where there is significant evidence contrary to her position. I find no error with the ALJ's assessment that Lebron does not need a job coach incorporated in her RFC finding.

> **B.** **The ALJ's decision regarding Lebron's third-party function report was supported by substantial evidence.**

Furthermore, I find no error with the ALJ's assessment of the report from Lebron's providers at the Erie County Board of Developmental Disabilities. Lebron also raises error with the ALJ's consideration of the function report submitted by her service coordinators at the Erie County Board of Developmental Disabilities. (*Id.* at pp. 12-14). She states that the evidence in the record supports an opposite conclusion, and that the ALJ failed to build an accurate and logical bridge between the evidence and the result. (*Id.* at pp. 13-14).

The Commissioner, by contrast, argues Lebron must point to more than just that evidence in the record which supports her position – she must show that there is not sufficient evidence to allow reasonable minds to accept the ALJ's conclusion. (ECF Doc. 9, p. 17). The Commissioner states that Lebron has not made this requisite showing, and instead asks this Court to reweigh the evidence, which it may not do. (*Id.* at pp. 17-19).

Here, the ALJ provides the following assessment of the third-party function report:

16

> The undersigned has also considered a third-party function report completed by Paula Washek and Nick Sennish, the claimant's service coordinators at the Erie County Board of Developmental Disabilities, to the extent that the report constitutes their personal observations of her symptoms, limitations and activities. They indicated the claimant has difficulty understanding expectations and needs to have information rephrased or reworded, and that she becomes overwhelmed easily when she cannot process information quickly enough. The undersigned has fully considered this in finding the claimant is limited to simple, routine, repetitive, one- to two-step tasks, with instructions to be delivered by demonstration, in addition to verbally and/or in writing alone. Restrictions in the assessed residual functional capacity on work pace, decisions, and changes further accommodate her limitations in this regard.
> . . .
>
> The undersigned further points out that several of the limitations reported by Ms. Washek and Mr. Sennish, such as the claimant's need for reminders and assistance in taking medications, an inability to follow directions for cooking, and inability to manage her own funds, are contradicted by the other evidence of record. The claimant reported to the Erie County Board of Developmental Disabilities that she is able to self-administer her medications, with only occasional reminders from her boyfriend or mother. She was also reported to be independent in paying bills and responsible for her own finances without a need for additional supports to make purchases. The claimant testified that she was able to follow recipes and add ingredients when she was working as a baker. In fact, the records from the Board of Developmental Disabilities note that the claimant is very independent and requires little support or assistance from others. For these reasons, the function report completed by the claimant's service coordinators has little persuasive value.

(Tr. 31) (internal citations to the record omitted).

More specifically, Lebron states that the ALJ was "incorrect" and that her statement was "contrary to the evidence" when she found that "plaintiff was very independent and required little support or assistance from others" (ECF Doc. 7, p. 12, citing Tr. 31). However, turning to the record cited by the ALJ makes clear that the statement is correctly recorded in the decision. It states "Marta's natural supports are her boyfriend and he will assist her when needed. She is very independent and requires minimal supports from others. At this time, there is no back up plan, and one i[s] not needed due to her independence." (Tr. 555). I find no error with the ALJ's finding and determine it is supported by substantial evidence.

17

I also take issue with Lebron's argument in her brief that the ALJ made statements contrary to the evidence of record:

> Rather than rely on this evidence, the ALJ found that "if her symptoms and limitations were as limiting as she has alleged, she would be willing to avail herself of the recommended treatment take medications consistently in an effort to obtain some measure of relief." This statement was contrary to the evidence in the record documenting Plaintiff's need for additional assistance along with the fact that in 1994, she had a full scale IQ of 67.

(ECF Doc. 7, p. 11, citing Tr. 32, 420). Lebron takes this discussion by the ALJ out of context – in it, the ALJ discusses Lebron's limited treatment for her physical impairments, including her failure to follow up to obtain a CPAP machine, and being noncompliant with her medications. (Tr. 32). Lebron has not raised error with the ALJ's decision regarding her physical impairments and these arguments have been deemed waived. *See Kuhn v. Washtenaw Cnty.,* 709 F.3d 612, 624 (6th Cir. 2013). This argument with respect to the ALJ's reliance on evidence demonstrating Lebron's noncompliance with treatment for her physical impairments is not well taken.

Even if Lebron may have weighed the evidence differently, it is not for this Court to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Williams-Dorsey,* at *7, citing *Reynold v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th. Cir. 2011). I find the ALJ has made no error and decline to recommend remand on this basis.

## V. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Lebron's applications for DIB and SSI be affirmed.

Dated: October 16, 2024

Reuben J. Sheperd
United States Magistrate Judge

---

**OBJECTIONS**

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, \*2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).